The next matter, number 23-1305, United States ex-rel Martin Flanagan v. Fresenius Medical Care Holdings, Inc. At this time, would counsel for the amicus, United States, please introduce himself on the record. He has a five-minute argument. Good morning, Your Honor. May it please the Court, Daniel Winnick for the United States as amicus. We don't take a position in this case on the ultimate outcome of the Rule 9b analysis or on leave to amend. Our position is simply that if Fresenius gave doctors and hospitals kickbacks to induce them to refer patients for dialysis services, and if those referrals happened, and if claims for the dialysis were submitted to Medicare and Medicaid, those were false claims within the meaning of the False Claims Act. I'd like to make just two points in particular about this case. First, to discuss how the facts here illuminate why but-for causation is not the appropriate standard, and second, to talk for just a moment about how the Court should think about the relationship between this case and Regeneron. So to start with the first point, when doctors and hospitals refer patients for dialysis services, just as when they make any number of other decisions about patient care, we need them to make those decisions solely on the basis of the patient's best interests and not under the influence of financial considerations. That's why Congress forbade kickbacks in themselves, regardless of whether they can be shown to have produced a concrete change in medical decision-making. It's why Medicare and Medicaid will pay only for conflict-free care, and it's why years before the 2010 Amendment, the anti-kickback statute, claims for the items and services that kickbacks were given to induce were considered false for FCA purposes, because those claims are categorically ineligible for reimbursement. There's no basis to believe that when Congress enacted the 2010 Amendment, in an effort this Court has already said in Guilfoyle to make it easier to prove FCA actions based on anti-kickback statute violations, that it meant to impose a new requirement for but-for causation that's foreign to the AKS and to the long body of case law preceding the 2010 Amendment. What type of case, if there were no but-for requirement, can you picture a case that that would defeat the case even though a certification claim was brought, a false certification claim was brought? Sure. So this Third Circuit's decision in Greenfield is exactly such a case. As the United States urged as amicus in that case, what the Third Circuit said is that in that case, a pharmacy had given kickbacks to two non-profits to induce them to make referrals by recommending its services to patients. And then after that, the pharmacy submitted claims for prescriptions that it provided, and the question was whether those claims were false. And the Court said no, because there was no evidence that the patients in question, the claims in question, had seen or heard of the referrals, and so they weren't among the patients who the kickbacks were given to induce. And so that's exactly such a case. There has to be a specific connection between the kickbacks and the claims, but that connection is that the claims are for the items or services that the kickback was given to induce. So that's an example of a case where there's no nexus. So you're saying the standard form certification would not cover the situation that you want to be covered by the but-for causation standard? Our position is that both under the false certification theory that predated the 2010 Amendment and under the 2010 Amendment, the requisite connection is that a claim be for the items or services that a kickback was given to induce. And there has never been a requirement that the items or services not have been provided but for the kickback. If I could speak just briefly about how we think the Court should consider the relationship between this case and Regeneron. So at the time we briefed this case, Regeneron and Teva weren't before the Court, and we therefore thought it was important that the Court go out of its way to reject the District Court's causal nexus requirement as articulated in this case. Now that the Court is deciding Regeneron, we don't think it's necessarily important for the Court to say something about causation in this case. Obviously, it's unclear what role causation plays in the District Court's Rule 9b analysis. If this Court thinks that causation is relevant or could be relevant to 9b analysis, it may well make sense to vacate and remand the decision here in light of what the Court says in Regeneron. And that's true whether the Court agrees with us in Regeneron, in which case obviously the District Court's causal reasoning here was wrong, or if it disagrees with us in Regeneron because in that case the District Court would need to consider the application of the false falsity, which it seems not to do in its ruling. Unless the Court has further questions, I'm happy to see my remaining 30 seconds back to the relator, and I'll be up again in Regeneron. We'll discuss this further, but your position is that your causation standard is not just raised as a presumption, but is irrebuttable. Correct. That the relevant question isn't, do you presume that it was actually caused, or actually caused in a but-for sense. Our position is that resulting from in the 2010 Amendment does not mean but-for causation, and therefore if you show a kickback was given to induced items and services, they happened and a claim was submitted for them, that is all of the causal nexus required by the 2010 Amendment. Thank you, Your Honor. Thank you, Counsel. At this time, would Counsel for Appellant Flanagan please introduce themselves on the record to begin? May it please the Court, I'm Jamie Bennett. I'm here representing the relator, Martin Flanagan. This is an appeal from the District Court's denial of the relator's motion to amend the complaint and from the District Court's granting of the dismissal of the amended complaint. The District Court dismissed the complaint based on the fact that the relator had failed to allege specific false claims. I'm going to flip the script a little bit here because I know that the issue of causation is going to be addressed at some length in the next argument, and I want to begin by addressing the District Court's decision to deny leave to amend. First of all, as I mentioned, the District Court had dismissed the amended complaint because there were no specific false claims and then denied the relator leave to amend to include information about specific false claims that the relator came into possession of after the Court's dismissal order was entered. There's an uncontroverted affidavit from my co-counsel, Mr. Simmer, about the process by which the relator came into possession of claims that showed that physicians who had received remuneration from Fresenius in order to generate referrals had actually made referrals to Fresenius Clinics and that those claims were billed to Medicare and that Fresenius received payments from Medicare for those claims. Is there some reason that information could not have been discovered earlier? The affidavit addresses that question, the efforts that Relators Council made to find claims data, including going to the Renal Dialysis Association, I may have that name wrong, scouring the internet, and then just by a lucky chance we found a subrogation company that was willing to provide claims data that included specific claims made by the remunerated physicians to Fresenius. Is there anything in the record, or perhaps I missed it in your filings to the District Court, but any evidence of when you requested the claims data? I know when you received it, but when was it requested? No, there's nothing in the, I don't believe there's anything in the affidavit that says when the information was requested, but there is information in the record that says that the relator moved to amend the complaint two days after it received the information that's included within the proposed second amended complaint. Could you clarify for me the chronology here? You filed the claim, it got unsealed. After it got unsealed, the adequacy of the pleading was then challenged by the other party based on the failure to plead an actual false claim. And that got briefed and re-briefed and years went by. At no point during that time was there, do we have any record of what was being done to find an actual false claim? The court's decision came down, and then less than two months later, the information came forward. Yes. The affidavit sets forth the efforts that were made. As I said, going to the national dialysis. Does it place those efforts in chronology? I'm not sure, Your Honor, to be honest. I don't think it does give specific dates when efforts were made to. So you're talking about the affidavit of the lawyer who... Mr. Simmer, yes, my colleague, my co-counsel. And so we have no information in the record at all as to what, if any, efforts were made during the many years where your pleading was being challenged for the lack of the results of such effort. And then two months after the court rejected your argument that the efforts weren't needed, we get the affidavit. Yes, I understand what the court is asking. But the fact of the matter is that the affidavit supplied by Mr. Simmer is uncontroverted. And I would point out that if Fresenius had information that their claims data was available generally to the public on the internet, for example, they could have challenged that affidavit. So the record before the court is that it is uncontroverted that the relator did not have this information until after the dismissal. What evidence is there that the relator, during the many years the case was pending, could not have undertaken the same efforts that apparently they were able to undertake in less than two months after the decision came down? So it's important for the court to understand what the chronology of this case is, what the history of it is. The case was pending for six or seven years in front of the District of Maryland. And the District of Maryland sits within the Fourth Circuit, which has a different standard in terms of what has to be alleged in order to survive dismissal. But we're trying to figure out the time frame of the due diligence efforts to find missing information. That's what's missing. The efforts in the affidavit are there, but the time frame of the due diligence is not there. The due diligence is described in the affidavit. But not when the due diligence request was undertaken. Yes, but if I could move on to, I agree with the court, that is the limitation on the affidavit. That it doesn't specify at what point these efforts were made. But the fact of the matter is that we are faced with a dismissal order which suggests a standard, a heightened pleading standard, that required us to provide information about a specific physician who made a specific referral as the result of a specific unlawful practice. So in terms of the transfer of the case from a circuit where that wasn't necessary to a circuit where that particular pleading standard had not been articulated in any case prior to Judge Saylor's adopting that in the dismissal order. You mean Carvelis? You don't read Carvelis as the root of that standard? My understanding of Carvelis is that it does not require the relator to allege a specific physician who made a specific referral as a result of a specific remuneration practice. I did not understand Carvelis as requiring that. You don't think we've described it as setting forth a general rule to that effect that you have to plead a specific false claim? There's a difference between requiring a specific false claim and requiring that a specific physician made a referral as a result of a specific illegal practice. What Carvelis requires in our view is that the relator allege some details about some claims that were submitted. And we feel that the amended complaint without the additional information that would have been included within the proposed second amended complaint does that. And I'd just like to, I'll skip to that part of my argument, which is that the one example of Dr. Tillis, who was paid by Fresenius for referrals, Fresenius acknowledges in their internal documents that his referrals were critical to the patients who were at Los Gatos and San Jose clinics, and that the claims must have been paid by Medicare, some of those claims must have been paid by Medicare, because the data that we have from Fresenius' own internal documents are that up to 10 percent of, and maybe 12 percent of the patients are commercial pay, the remainder are Medicare. So then we have Fresenius calculating the return to their net profit from that one doctor, which was $714,000 per year, and the overall allegations of the complaint that the purpose of this kickback scheme was to induce referrals so that Fresenius could bill and profit from those referrals. There's no evidence in the amended complaint that Fresenius had some commercial patients. It billed for all the patients, some of those must have been Medicare patients, and it appears... And what's the premise? I think the argument, as I understand it, one argument is maybe the referring physician just sent the non-governmental pay claims. But that's not part of the amended complaint, Your Honor. There's no allegation in the amended Right, but you can answer this. Is there any allegation that would push back on the possibility see, if you had a specific claim, everyone could look at it and they'd know, well, that's Medicare, and so there's no doubt about it. As I understand your argument, you're saying this one physician sent over a whole raft of claims, and we know that generally X percent of them, large percentage of claims in general, will be Medicare paid. So the assumption is there must be at least one, in fact, many more than one in that batch. All that would be true unless the doctor had a large enough practice where the number he sent over was just the subset of non-Medicare claims. So is there anything in the data that pushes back on that so we could say that that isn't a hole in the pleading? Your Honor, I feel that that's one of the legal errors that Judge Saylor made, and that is that instead of taking the well-pleaded allegations of the complaint and drawing inferences in favor of the relator, that Judge Saylor took the well-pleaded allegations and drew inferences that were adverse. There's nothing in the complaint whatsoever to suggest that the physician separated out commercial pay patients and only sent commercial pay payments to Fresenius Clinics. But is there anything in the description of the whole thing that would make that not likely? Yes, Your Honor. Sorry, I didn't mean to interrupt you. That's fine. You go ahead. Yes. There is that the well-pleaded allegations of the complaint are that Fresenius developed this scheme in order to maximize its profits and grow its clinics. So the overall and the scheme cost Fresenius millions of dollars. So that supports, in my view, that Fresenius would not have excluded billing for Medicare and Medicaid patients because that would not have supported their goal of growing the financial situation and the clinical patients. To just leave the Medicare and Medicaid patients on the table and only bill for the commercial patients just doesn't make sense in light of these other allegations, Your Honor. Matt, sorry, can I just focus you in? I think you're suggesting in your brief that because the Medicaid claims are submitted by the states to the federal government, that those false claims are caused to be not actually submitted by Fresenius? Yes, Your Honor. So I understand that correctly? Yes, Your Honor. Okay. So then I guess I just have like two sort of follow-up questions, which is what are we to make a crevallis where that situation was sort of the same? And secondly, if you look at the complaint, does the I'm sorry, Your Honor, I'm not following that question. Okay. When we look at the complaint here, does it set out that Fresenius submitted the Medicaid claims? No, absolutely not. Okay. You mean the theory that Fresenius caused the states to submit Medicaid claims? No, that's not a claim that Fresenius submitted the claims. Okay. So I'd like to Time is up. My time is up. Thank you, Your Honor. Thank you, counsel. At this time, if counsel for the appellee would please introduce himself on the record to begin. He has a 15-minute response. Thank you, Your Honors. May it please the Court. I'm Jim Bennett representing Fresenius. To start with your question, Your Honor, the Medicaid claims are submitted by Fresenius to Medicaid. That's what's alleged in the complaint. And the only issue with Medicare is that at some later date, the state gets a reimbursement from Medicare. And so this is not a non-presentment claim for Medicaid, and it is not a situation where some other entity other than Fresenius says, here's the services. We submit the claims to Medicaid, and then they get a portion of it back. And you make a very good point that that's the case in every single False Claims Act case. That's how Medicaid works. And so you can't have it be the law that, okay, well, Medicaid somehow either becomes indirect under this court's jurisprudence, or it's only a presentment claim, because that would be the case in every one of them. What really matters for this court's jurisprudence is, is it the defendant that prepares the information, does the underlying conduct, and sends in the information to try to get paid? And that's exactly what we have here and what we had in Carvalho's. And so that's not a distinction that has ever been drawn in the case law, and not a distinction that makes sense based on the logic of this court's opinions. As to the observations that were made that we have a significant number of government payer patients, I think the court's questions were correct, though, that this really goes to what the 9B problem in this case creates. We don't have a specific claim. We don't have an allegation that this one doctor negotiated a non-fair market value medical director, and here's why it's non-fair market value, and that as a result he was incentivized or she was incentivized to refer a patient, and then that patient treated on X day. In fact, they allege, as a significant part of their claim, that hospital patients are the ones that are at issue, and Medicare has a waiting period before you can even get on government payments, and people who initially come on to dialysis have a three-year period where they're covered by commercial, and that's set out in the regulations, and we cite those in the brief. And so these highly generalized allegations that Judge Saylor recognized really put us in that DiAgostino situation, where this court rejected the idea that 50 to 60 percent are Medicare, therefore there must be a false claim. Haggerty said 50 to 60 percent, and then the cases go on to say that if you just claim all, that's even less helpful. So my question is... Does that make sense, just put aside the case law, just reasoning mathematically, if you have a very large volume of claims, a doctor or a hospital sending over all their claims, and we know that 70 percent of those are Medicare paid, wouldn't it be virtually certain that at least one of those claims is a Medicare claim? Well, the case law even talks about it having logic and not irrational to assume, but that takes us, I think, into the 9B world. What's the purpose of 9B? And the purpose of 9B is to say you need to do these things with specificity, because there's notice issues, but also what you don't want to do is have a relator like the one here who knows nothing about this, right? He had no job duties about medical director agreements, no job duties about claims, and so if you just have somebody say, oh, a healthcare provider has a lot of Medicare patients, you can end up like we are here, with a whistleblower, who doesn't have any firsthand information. Normally we would have a relator who worked in medical directors here, understood the relationships, understood the negotiations, followed a patient and did that. Here they're admitting that they have so little information that they had to go find some other source to try to get it. So I think 9B is independent. That's not quite fair. They have a lot of firsthand information that for purposes of allegations and construing a complaint, as to the existence of the scheme, what they don't have is knowledge that they can point to any particular patient. I actually would respectfully disagree with that. This person worked in a Texas area doing something unrelated to medical director agreement. All of those allegations are about things that they found on the Internet or through third-party sources. It's not Mr. Flanagan who is saying any of these things. He admits and alleges that he only had an acute contracting role, nothing to do with medical director agreements. And that's why they have the problem with the specific claim. Because we don't have a relator, which you would normally have here. We have tens of thousands of employees who would actually have all this firsthand information. But that's why he doesn't have the claim, because he has no firsthand knowledge that allows him to plead with specificity, the existence of the claim, because all he knows is we have medical director agreements. So you're saying because he doesn't know a patient's name and the claim, we therefore should not assume that his allegation about the scheme for pleading purposes is correct? I think what I am saying more is you shouldn't excuse the Carvalis standard because of that. I am not trying to say that you need to say that an allegation in the complaint is false or not to be credited. What I am saying is there is no reason under these circumstances to excuse the claim requirement that clearly exists for these direct claims, because that is part of the logic of it, which is you have a false claim to that case that presents reputational harm. Here they are asking for apparently billions of dollars. The case law recognizes that that type of thing is one of the things 9B protects. So my argument isn't disregard an allegation in the complaint. My argument is that the normal 9B standard to come up with a specified claim makes sense here, and is logical and shouldn't be excused under these circumstances, and it's part of what 9B requires. These are unquestionably direct claims. The allegation complaint is repeat. Why once they got it, why wasn't it an abuse of discretion for the district court to allow the amendment? There are a few different things that happen here that make it so. First is the motion for leave to amend was filed after the judgment was entered, and after they filed a Rule 59e motion, a post-judgment motion. There is a little bit of a different standard that applies after the judge does a 36-page decision that ends the case in total. They filed a post-judgment motion and then filed a motion for leave to amend. Secondly, this does come extremely late. 2014 was when the case was filed. The amendment was sought nine years thereafter, and we did move to dismiss for the failure to identify a specific claim in the District of Maryland in 2021. And we did that on March 5th of 2021, and this amendment is two years later. It is 100% correct, as everyone has noted and counsel acknowledged, that there is no discussion of why or when they started asking for this information or to get it. And it is also the case that if we look at this, since it's post-judgment, it's not even Rule 15, but even if we adopt a Rule 15 approach, Judge Saylor, I think, was totally correct that you don't have... I mean, we filed three motions to dismiss. We filed a motion to dismiss in Maryland that there was no false claim. They amended in Maryland. We filed a motion to dismiss that there was no false claim. The case was transferred because the District Judge in Maryland said there's absolutely no connection here and there's no reason to be here at all. There's no tie there at all, and we refiled in Massachusetts, and no amendment was filed or no effort was undertaken to get these claims. And then finally, only after the judge rules do they come up with this new data, which timing-wise is after the ruling, and the judge noted that this court has a long history of saying, you don't have a party like we did file three motions to dismiss and fully brief them. A judge have a several-hour oral argument on it, write a 36-page opinion about it, and then get a new try on it, and I would refer your honor to... Does Maryland precedents require pleading a specific claim like our circuit does? We certainly argued that in the motion to dismiss them. I know you argued it, but do you believe their precedent requires it? We believe 9B requires that universally the case. That is exactly what 9B says. It's the who, what, where, when, why, and every circuit says that what matters is the claim for payment and the False Claims Act. This court says it's the sine qua non of the False Claims Act, and that is a universal doctrine. So we believe that 9B applies everywhere, 9B requires specificity around the False Claims, and that we certainly put them on notice of that, and we do have a brief that argues it in the District Court of Maryland. And so if you wanted to try newly discovered evidence, one of the requirements of newly discovered evidence would, of course, be diligence, right? If you wanted to argue, like, I was diligent and I didn't get this, you have to show that you could not, in the exercise of reasonable diligence, have obtained it earlier. That's Miami Firefighter's case from this court, but there's no effort to do that here, and in fact, when you look at the data that they got, it goes back to 2011 to 2018, and the Gee versus Takeda case, which denied a motion for leave to amend, even said that a relator could have got an expert witness or other information earlier as well. And so Judge Saylor has considerable discretion, even under Rule 15. This is post-judgment, and so I think that the amendment decision was correct in this instance, but it's certainly not an abuse of discretion. Given that there is no false claim here that's identified, we end up in the problem, I think, that Your Honor recognized, which is the lack of specifics about the situation and the complaint that results in the dismissal, which is we just don't have any of these well-pleaded allegations that take even one patient through. Sometimes one patient, like in the case of Escobar, they had one patient where they identified 27 different situations where this happened, said who it was, how it happened, why it happened. We don't even have that, and what we have instead is a series of generalities, and therefore we believe that Judge Saylor was 100% correct under established precedent to do this. The arguments that they have in response are, well, all the claims are false, or 50%, or 90%, or 70%, or Medicare, or I think they said 80% in their petition, but this court has a lot of cases that say that that is insufficient. And so then we can turn to the causation decision, I think is just one observation by the judge. I think Judge Saylor in this case did not weigh in, right? You know he didn't cite Cairns, he didn't cite Martin, Martin wasn't down yet. I know you'll have a nice discussion with the next counsel on all of the nuances of this, but I think it's important to note that I don't think anybody is saying that there is no causation standard. I believe the government's now saying a factual connection in the Regeneron case. I think this court's observations in the retaliation context in Guilfile talk about there being causation, and all the judge did in our case was literally cite the statute. But we have patients in our clinics that aren't referred by medical directors. We have patients in our clinics that are referred by other doctors, of course, even the charts that they have in the complaints show that. We have commercial-pay patients, we have no-pay patients. And so even if you take a very loose causation standard, there's no allegations of it. But, of course, we, as you saw in our briefing, firmly believe that, but for under Burrage and Cairns and Martin is the correct standard. The judge here just, whatever standard was applied, observed that causation means you still have to have a false claim. And that's how he used it. It wasn't really to weigh in on the circuit split. It was really to say, AKS doesn't eliminate causation as an element, and I don't think anyone contends that it does. And I think that that is a point that he used to say that's why your cases, the First Circuit cases, that talk about the need for a false claim to be specifically pled still apply here. And so this should be affirmed no matter how the next case turns out. Of course, if you affirm the next case, this is a very easy case because there's no allegation of causation whatsoever. So we would ask that both decisions be affirmed, the motion for leave to amend for the reasons we said, and that it's a really straightforward claim. It's a long complaint, right? You guys saw that. It's 100 pages. But I think it's important to note that you guys often face those, right, and that there are important cases where they have said, like D'Agostino affirmed a Rule 9b dismissal where this Court said we confront a proposed complaint that covers 123 pages with extensive single-space excerpts, but they didn't have the allegation that mattered, which is just like this. Carvell has had a 93-page complaint describing the scheme in detail, and you can't substitute in volume for what you really need under the FCA, which are the specifics under 9b of an actual false claim. Thank you, Your Honors. Thank you. Thank you, counsel. That concludes argument in this case.